**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

|  |  |
|---|---|
| COMMONWEALTH OF KENTUCKY ex. rel. RUSSELL COLEMAN, ATTORNEY GENERAL,<br><br>               Plaintiff,<br><br>      v.<br><br>EXPRESS SCRIPTS, INC., et al.,<br><br>           Defendants. | Case No. 5:24-cv-00303-KKC |

**DEFENDANT OPTUMRX, INC.'S**
**<u>MOTION TO DISQUALIFY MOTLEY RICE</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 4

    A.    Motley Rice used government subpoenas to investigate OptumRx on behalf of three governments. ................................................................................................. 4

    B.    Motley Rice is pursuing private litigation against OptumRx that overlaps with the issues in Motley Rice's government investigations. ........................................... 7

    C.    OptumRx has moved to disqualify Motley Rice in other opioid cases .................... 8

LEGAL STANDARD ....................................................................................................... 9

ARGUMENT .................................................................................................................... 9

I.    MOTLEY RICE'S REPRESENTATION OF THE COMMONWEALTH VIOLATES RULE 1.11(c) ............................................................................................................ 9

    A.    Ethics rules have long forbidden lawyers' misuse of government power for private gain ................................................................................................................ 10

    B.    Motley Rice has violated Rule 1.11(c). ............................................................... 12

        1.    Motley Rice was a "public officer or employee" when it investigated OptumRx, and the Commonwealth is the firm's "private client" here. ..... 12

        2.    Motley Rice obtained "confidential government information" about OptumRx through the D.C., Hawaii, and Chicago investigations. ............ 13

        3.    Motley Rice could use the confidential government information to OptumRx's "material disadvantage" in this case. ...................................... 17

II.    THE COURT SHOULD CONDUCT ITS OWN INDEPENDENT ANALYSIS OF THE FACTS AND LAW AND REJECT OTHER COURTS' INCORRECT APPLICATIONS OF RULE 1.11(c). ................................................................................................... 19

III.    THE REMAINING FACTORS WEIGH IN FAVOR OF DISQUALIFICATION. ......... 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Realty of St. Paul, Inc. v. Exchange Nat'l Bank of Chi.*,
   283 F. Supp. 464 (D. Minn. 1968) ............................................................11

*Anne Arundel County v. Express Scripts, Inc.*,
   2025 WL 254807 (D. Md. Jan. 21, 2025) ...........................................9, 13, 23, 24

*Camreta v. Greene*,
   563 U.S. 692 (2011).............................................................................20

*In re Carpenter Co.*,
   2014 WL 12809636 (6th Cir. Sept. 29, 2024) ................................................22

*City of Boston v. Express Scripts, Inc.*,
   No. 1:24-cv-10525 (D. Mass Oct. 18, 2024) (ECF No. 94) ........................8, 23, 24

*Culbreth v. Covington Bd. of Educ.*,
   2007 WL 3124711 (E.D. Ky. Oct. 24, 2007)...................................................25

*Firexo, Inc. v. Firexo Grp. Ltd.*,
   99 F.4th 304 (6th Cir. 2024) ...................................................................20

*Gen. Motors Corp. v. City of New York*,
   501 F.2d 639 (2d Cir. 1974)................................................................11, 19

*Handelman v. Weiss*,
   368 F. Supp. 258 (S.D.N.Y. 1973) .............................................................11

*People ex rel. Harrison v. Express Scripts, Inc.* (*L.A. County*),
   No. 23STCV20886 (Cal. Super. Ct. Nov. 14, 2024) .....................................*passim*

*Hilo Metals Co. v. Learner Co.*,
   258 F. Supp. 23 (D. Haw. 1966) ...............................................................11

*Hometown Pizza, Inc. v. Hometown Pizza II, LLC*,
   2022 WL 2392642 (W.D. Ky. July 1, 2022) ...................................................9

*Kronberg v. LaRouche*,
   2010 WL 1443934 (E.D. Va. Apr. 9, 2010) .........................................14, 17, 22

*Moses v. Sterling Com. (Am.), Inc.*,
   122 F. App'x 177 (6th Cir. 2005) ..............................................................9

*In re Nat'l Prescription Opiate Litig.*,
    2019 WL 1274555 (N.D. Ohio Mar. 20, 2019) ....................................................17, 18, 19, 22

*In re Nat'l Prescription Opiate Litig.*,
    2024 WL 3387288 (N.D. Ohio Mar. 18, 2024) ............................................................ *passim*

*In re OptumRx, Inc.*,
    2024 U.S. App. LEXIS 26695 (6th Cir. Oct. 22, 2024).........................................8, 20, 23, 24

*Seattle Times Co. v. Rhinehart*,
    467 U.S. 20 (1984).........................................................................................................22

*Umphenour v. Mathias*,
    2008 WL 2785609 (E.D. Ky. July 16, 2008)...........................................................................9

*United States v. Villaspring Health Care Ctr., Inc.*,
    2011 WL 5330790 (E.D. Ky. Nov. 7, 2011)........................................................9, 13, 17, 22

**Statutes**

5 U.S.C. § 552.......................................................................................................................21

5 Ill. Comp. Stat. 140/7(g) ...................................................................................................15

Chi. Mun. Code § 2-25-090(a) .............................................................................................14

D.C. Code § 2-534(a)(1) .......................................................................................................15

D.C. Code § 28-3910 .........................................................................................................5, 14

Haw. Rev. Stat. § 28-2.5 .......................................................................................................14

Haw. Rev. Stat. § 480-18 ......................................................................................................14

Haw. Rev. Stat. § 480-18(j) ..................................................................................................15

Haw. Rev. Stat. § 661-22 ......................................................................................................14

**Other Authorities**

5 C.F.R. § 2635.703(b) ..........................................................................................................21

ABA Comm. on Ethics & Prof'l Resp., Formal Op. 509 (Feb. 28, 2024)............................ *passim*

Canons of Prof'l Ethics, Canon 36 (Am. Bar Ass'n 1928) ...........................................10

*Double Dipping in Opioid Lawsuits*, Wall. St. J. (Jan. 1, 2024),
    https://tinyurl.com/OpioidDoubleDipping...................................................................3

*Joe Rice Appointed Co-Lead for Opioid MDL*, Motley Rice (Jan. 5, 2018), https://www.motleyrice.com/news/opioid-mdl-joe-rice-appointed-co-lead ............................ 7

Ky. R. Prof'l Conduct 1.11(c) ............................................................ *passim*

Ky. R. Prof'l Conduct 1.11, cmt. 4 ............................................................ 13

Ky. R. Prof'l Conduct 1.11, cmt. 8 ............................................................ 17

LR 83.2 ............................................................ 1

LR 83.2(a)(3) ............................................................ 9

LR 83.3 ............................................................ 1

LR 83.3(c) ............................................................ 9

N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 1169 (2019) ............................ 22

N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 1187 (2020) ............................ 22

Neb. Ethics Advisory Op. for Lawyers No. 22-01 (2022) ............................ 22

O.H. Skinner, *States Hiring Outside Lawyers Need to Ask Who Else They Represent*, Bloomberg Law (Jan. 23, 2024), https://tinyurl.com/HiringOutsideLawyers ............................ 3

*Public Client Litigation Area*, Motley Rice, https://www.motleyrice.com/public-client (last visited May 30, 2025) ............................ 7

*The Tort Bar's Legal Double Dipping*, Wall St. J. (Dec. 9, 2022), https://tinyurl.com/LegalDoubleDipping ............................ 3

## <u>INTRODUCTION</u>

In accordance with Kentucky Rule of Professional Conduct 1.11(c), LR 83.2, LR 83.3, and this Court's inherent authority, Defendant OptumRx, Inc. respectfully moves the Court for an order disqualifying the law firm Motley Rice LLC and its attorneys from participating in this litigation.

With increasing regularity, State Attorneys General and local governments are deputizing private lawyers as Special Assistant Attorneys General to investigate businesses. The arrangement allows the governments to transfer litigation risk to private lawyers while retaining the opportunity to seek damages in cases that they would not otherwise pursue. The private lawyers, in turn, get to leverage government power against private litigants on a contingency-fee basis without the limits on personal financial benefits that apply to fulltime government prosecutors. Some private lawyers go even further and use the information gained from their government investigations in separate contingency-fee litigation for other clients. The Rules of Professional Conduct—here, Kentucky Rule of Professional Conduct 1.11(c)—expressly prohibit this practice. But that has not stopped those lawyers from suing the targets of their government investigations for their private clients. That should alarm anyone concerned with preventing abuse of power and should raise red flags for courts.

Rule 1.11(c) prohibits former or existing government lawyers from taking on private representations where they could use the confidential information that they learned during government service to the material disadvantage of an adverse party. The rule is designed to protect against abuses of government power and the erosion of the public trust. The concerns are so grave that the Rules prohibit a former government lawyer from even taking on a representation in which they *could* use confidential government information to their opponent's material disadvantage—even if they do not *use* the information at all. Rule 1.11(c) sits against the backdrop of Rule 1.11—a rule designed to impose *special* ethical requirements on government lawyers *above* those

1

generally applicable to all lawyers. Those requirements provide clarity on when and how lawyers may move between government service and private practice. In doing so, Rule 1.11(c) imposes clear prohibitions designed not merely to protect litigants but even more critically to protect the sanctity of the role of government lawyers and prohibit the abuse of government power.

By representing the Commonwealth of Kentucky in this case against OptumRx, Inc., Motley Rice LLC is violating Rule 1.11(c) and should be disqualified. Three governments—the District of Columbia, Hawaii, and the City of Chicago—deputized Motley Rice to lead investigations into OptumRx using investigatory subpoenas (the state equivalent of a federal civil investigative demand) that demanded wide swaths of confidential business information. To comply with those government subpoenas, OptumRx engaged in meetings with Motley Rice and produced thousands of pages of confidential information directly to Motley Rice detailing how OptumRx operates its PBM business. Through those investigations, Motley Rice received information about how OptumRx develops formularies (lists of drugs that a health plan can choose to cover), the clinical programs that it offers clients, and how it negotiates with pharmaceutical manufacturers for prescription drug discounts (rebates). With that information, Motley Rice compiled confidential reports (that not even OptumRx has access to), summarizing its investigations and the information it obtained through them. No one knows what other information Motley Rice gathered about OptumRx through those investigations: Like virtually all government investigations, those details are shielded from public view.

Because Motley Rice obtained confidential information about OptumRx through those investigations, Rule 1.11(c) prohibits Motley Rice from taking on any private representation in which it *could* use that confidential information to OptumRx's material disadvantage. But that is exactly what Motley Rice did. With OptumRx's confidential information in hand, Motley Rice is

litigating opioid cases against OptumRx and other pharmacy benefit managers (**PBMs**) across the country, including in this case and in the national opioid multidistrict litigation in the Northern District of Ohio. The plaintiffs' legal theories (unfounded as they are) focus on OptumRx's development of formularies, the clinical programs that it offered clients, and how it negotiated with opioid manufacturers for rebates—the same topics on which Motley Rice obtained confidential information through its government service for D.C., Hawaii, and Chicago.

OptumRx does not challenge the government's authority to investigate, nor does it seek to intrude on any party's ability to select its counsel. But the ethical rules are clear: Motley Rice is not allowed to obtain confidential information about OptumRx by wielding government power and then wield that same information against OptumRx in private litigation. *See* Declaration of Matthew P. Hooker (**Hooker Decl.**) Ex. A (**Montgomery/Muchman Report**) at 1–2, 16–49. These ethical violations do not turn on Motley Rice's intentions or even on whether the firm's lawyers *actually* use the confidential information at all. It is enough that Motley Rice *could* use that confidential government information in separate litigations against OptumRx.[1]

OptumRx has sought disqualification of Motley Rice in other opioid cases, including in the opioid MDL. So far, the courts that have ruled on the motions have denied them based on several legal and factual errors, all of which trace back to the MDL court's ruling. Each of those decisions

---

[1] OptumRx is not the only one troubled by Motley Rice's conduct. *E.g.*, *The Tort Bar's Legal Double Dipping*, Wall St. J. (Dec. 9, 2022), https://tinyurl.com/LegalDoubleDipping (criticizing "unholy alliance[s]" between State AGs and plaintiffs' lawyers); *Double Dipping in Opioid Lawsuits*, Wall. St. J. (Jan. 1, 2024), https://tinyurl.com/OpioidDoubleDipping ("This double dipping would break the rules of professional conduct in nearly any industry, but it's an open scandal in the tort business."); O.H. Skinner, *States Hiring Outside Lawyers Need to Ask Who Else They Represent*, Bloomberg Law (Jan. 23, 2024), https://tinyurl.com/HiringOutsideLawyers ("I saw this firsthand in the Arizona Attorney General's Office. In that role, more than once, outside counsel seemed to see representation of a state as a gateway to increasing their return on investment in a related private action against the same defendants.").

was wrong. They placed inordinate emphasis on the MDL court's decision that some (but not all) of the investigation materials should be available in the MDL discovery repository. And compounding that error, the decisions failed to appreciate that the confidential information that Motley Rice obtained through its investigations is not limited to documents available through discovery in the MDL but also includes mental roadmaps and strategic insights about OptumRx, as well as the firm's attorney-client-privileged work product prepared during the investigations.

Under a principled, straightforward application of Rule 1.11(c), disqualification of Motley Rice in this case is required.

## **BACKGROUND**

### A.    **Motley Rice used government subpoenas to investigate OptumRx on behalf of three governments.**

Motley Rice has investigated OptumRx on behalf of at least three governments—the District of Columbia, State of Hawaii, and the City of Chicago—using the state-law equivalent of a federal civil investigative demand. In December 2020, the District of Columbia Attorney General retained Motley Rice to assist with a government investigation into and potential litigation against PBMs for possible violations of consumer protection law and the False Claims Act. Hooker Decl. Ex. B (**D.C. Engagement Ltr.**). The firm's retainer agreement with D.C. required Motley Rice to submit "monthly or regular status reports" as part of its "legal services" for the D.C. Attorney General. *Id.*, Statement of Work § 4.1.5; *see also id.* § 4.1.3 (requiring Motley Rice to "[a]dvise OAG on the conduct of the case and on strategy and tactics for each phase of the case"). The same month, the D.C. Attorney General issued an investigative subpoena to OptumRx regarding "the negotiation of prescription drug rebates and the administration of prescription drug benefits." Hooker Decl. Ex. C (**D.C. Subpoena**) at 1. The subpoena required OptumRx to produce broad categories of information, including information about manufacturer payments and negotiations

4

and formulary development and coverage. *Id.* at 9–12. It directed OptumRx "[p]ursuant to D.C. Code § 28-3910, and by the authority vested in the Attorney General for the District of Columbia" to produce its confidential documents "to the attention of: Linda Singer Motley Rice LLC." *Id.* at 1. Motley Rice served the subpoena on OptumRx. *Id.* (**Motley Rice envelope**).

Before responding to the subpoena, OptumRx negotiated a confidentiality agreement with D.C. *See* Declaration of Allison J. Caplis (**Caplis Decl.**) ¶ 8. The agreement prevented Motley Rice from using the confidential information that its lawyers obtained through the subpoena outside of the firm's work for D.C. *See* Hooker Decl. Ex. D (**D.C. Conf. Agmt.**) ¶ 2. Relying on that agreement, OptumRx produced confidential rebate information for various manufacturers directly to Motley Rice in July 2021. Hooker Decl. Ex. E; Caplis Decl. ¶ 13. Two months later, OptumRx produced more than 68,000 pages of unredacted, commercially sensitive information. Hooker Decl. Ex. F. The production contained OptumRx's confidential internal documents covering wide swaths of its business operations, including formulary development, clinical and formulary offerings to clients, and rebate negotiations with drug manufacturers. It also included charters, policies, and other materials about business strategy, formulary placement committees, and other aspects of OptumRx's business. *See* Caplis Decl. ¶ 14; Hooker Decl. ¶¶ 5–9. Several months later, in November 2021, OptumRx produced more confidential and commercially sensitive material, including rebate-related and consumer transaction-level data. Hooker Decl. Ex. G; Caplis Decl. ¶ 15. The vast majority of the information that OptumRx produced is nonpublic, proprietary and confidential commercial material. Caplis Decl. ¶ 16; Hooker Decl. ¶ 9.

Motley Rice's pre-litigation use of government power to investigate targets of their lawsuits was not limited to the D.C. investigation. In April 2021, the Hawaii Attorney General appointed Motley Rice as Special Deputy Attorney General to investigate PBMs, including

OptumRx. Hooker Decl. Ex. H (**Haw. Special AG Agmt.**). Hawaii's retainer required Motley Rice to "submit a report to the Attorney General of Hawai'i, as an attorney-client privilege/work-product communication" that would "recommend whether or not to sue" the PBMs and "set forth, at a minimum: (1) the facts or data considered in formulating the report; (2) a complete statement of investigative findings and the bases of such findings; [and] (3) an analysis of the propriety of the PBMs' billing practices[.]" *Id.* at A1-1 to -2. In October 2021, the Hawaii Attorney General issued an investigative subpoena to OptumRx. The subpoena sought over a decades' worth of documents relating to various aspects of OptumRx's business, including formulary development, rebate negotiations with manufacturers, and OptumRx's contractual relationships with manufacturers. Hooker Decl. Ex. I (**Haw. Subpoena**). Again, it directed OptumRx to deliver the documents to "Special Deputy Attorney General Linda Singer, Motley Rice LLC." *Id.* at 1.

As it did with D.C., before responding to the subpoena, OptumRx negotiated a confidentiality agreement with Hawaii. And again, the State agreed that Motley Rice could not rely "on Confidential Material in pursuing information or claims in any other matters outside of its representation of the OAG." Hooker Decl. Ex. J (**Haw. Conf. Agmt.**) ¶ 2. As with the D.C. investigation, OptumRx produced confidential information directly to Motley Rice, including the same more-than 68,000 pages of documents, rebate-related data, and consumer transaction-level data. Hooker Decl. Exs. K, L; Caplis Decl. ¶¶ 22–24; Hooker Decl. ¶¶ 5–9. With that information and the other fruits of Motley Rice's government investigation in hand (all of which would be detailed in Motley Rice's privileged investigation report—a report that is shielded from public view), Hawaii (still represented by Motley Rice) sued OptumRx and two other PBMs in October 2023. *See Hawaii ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, No. 1:23-cv-00464 (D. Haw.).

Motley Rice also investigated OptumRx on behalf of the City of Chicago. Chicago issued an investigative subpoena to OptumRx demanding information about various aspects of OptumRx's business, including pharmacy and client contracts. Hooker Decl. Ex. M (**Chicago Subpoena**). OptumRx and Chicago negotiated a confidentiality agreement (with similar restrictions as the D.C. and Hawaii confidentiality agreements) that Mimi Liu of Motley Rice executed as Chicago's "Special Assistant Corporation Counsel." Hooker Decl. Ex. N (**Chicago Conf. Agmt.**). In response, OptumRx produced confidential material including prescription claims data. *See* Declaration of Michelle S. Grant (**Grant Decl.**) ¶¶ 10–12.

### B. Motley Rice is pursuing private litigation against OptumRx that overlaps with the issues in Motley Rice's government investigations.

Motley Rice's website touts the firm's dual role as a government investigator and private plaintiffs' counsel, advertising that its "Public Client practice is dedicated to supporting public entities in investigations and litigation" and that it has "the resources and experience in complex litigation and resolutions to assist government lawyers."[2] Linda Singer, a member of Motley Rice, acts as co-chair of the opioid MDL's Manufacturer/Marketing Committee, and co-founder Joe Rice serves as co-lead counsel and a member of the opioid MDL Plaintiffs' Executive Committee.[3]

Motley Rice has litigated opioid-related lawsuits for years. But it was not until December 2022—after the firm investigated OptumRx on behalf of D.C. and Hawaii—that Motley Rice began actively litigating opioid lawsuits against OptumRx. Motley Rice now represents plaintiffs suing OptumRx across the country, including the Commonwealth here. The theories that Motley Rice presses against OptumRx in this case relate to the same aspects of OptumRx's business that

---

[2] *Public Client Litigation Area*, Motley Rice, https://www.motleyrice.com/public-client (last visited May 30, 2025).

[3] *Joe Rice Appointed Co-Lead for Opioid MDL*, Motley Rice (Jan. 5, 2018), https://www.motleyrice.com/news/opioid-mdl-joe-rice-appointed-co-lead.

the firm investigated as government lawyers. For instance, the second amended complaint alleges that the formularies and clinical programs that OptumRx offered its clients should have placed additional limits on opioid prescriptions while also contending that OptumRx "colluded with manufacturers to further boost opioid sales." ECF No. 30 ¶ 29; *see also id.* ¶¶ 11, 140, 269–70. Those allegations are false, but in any case, they relate to the same aspects of OptumRx's business that Motley Rice investigated for the governments—including formulary and clinical development, rebate negotiations, and client relationships.

### C.    OptumRx has moved to disqualify Motley Rice in other opioid cases.

In December 2023, OptumRx moved to disqualify Motley Rice in the opioid MDL. The MDL court denied OptumRx's motion but said that it "frown[ed] on" Motley Rice's actions. *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *16 (N.D. Ohio Mar. 18, 2024). In doing so, the court misconstrued Rule 1.11(c) to conclude that OptumRx's document productions in response to government investigations were not "confidential government information." The court then ordered OptumRx to produce those documents to all plaintiffs' counsel. *Id.* at *8–15. OptumRx petitioned the Sixth Circuit for a writ of mandamus, asking for it to order the MDL court to disqualify Motley Rice. Hooker Decl. Ex. O. The Sixth Circuit denied the petition because "mandamus is not the appropriate avenue to challenge a district court's disqualification order." *In re OptumRx, Inc.*, 2024 U.S. App. LEXIS 26695, at *1–2 (6th Cir. Oct. 22, 2024). In dicta, the panel opined that OptumRx would suffer no material disadvantage because the investigation documents "should have already been produced into the MDL discovery repository." *Id.* at *3.[4]

---

[4] OptumRx has also moved to disqualify Motley Rice in other opioid cases. The courts in those cases have denied the motions for some combination of the same reasons articulated by the MDL court. *See City of Boston v. Express Scripts, Inc.*, No. 1:24-cv-10525 (D. Mass Oct. 18, 2024) (ECF No. 94) (Hooker Decl. Ex. P); *People ex rel. Harrison v. Express Scripts, Inc.* (*L.A. County*), No. 23STCV20886 (Cal. Super. Ct. Nov. 14, 2024), *appeal docketed*, No. B343828 (Cal. Ct. App. Feb.

## **LEGAL STANDARD**

Attorneys practicing in Kentucky federal courts must adhere to the Kentucky Rules of Professional Conduct. *United States v. Villaspring Health Care Ctr., Inc.*, 2011 WL 5330790, at *2 (E.D. Ky. Nov. 7, 2011). "A district court has inherent authority to disqualify an attorney as a sanction for professional unethical conduct." *Umphenour v. Mathias*, 2008 WL 2785609, at *2 (E.D. Ky. July 16, 2008). And "District Courts have broad discretion over whether counsel should be disqualified." *Hometown Pizza, Inc. v. Hometown Pizza II, LLC*, 2022 WL 2392642, at *1 (W.D. Ky. July 1, 2022) (citing *Moses v. Sterling Com. (Am.), Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005)). Disqualification is proper "when there is a reasonable possibility that some specifically identifiable impropriety actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *Villaspring*, 2011 WL 5330790, at *2.

## **ARGUMENT**

### I.    **MOTLEY RICE'S REPRESENTATION OF THE COMMONWEALTH VIOLATES RULE 1.11(c).**

Kentucky Rule of Professional Conduct 1.11(c) states:[5]

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this Rule, the term "confidential government information" means information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or

---

5, 2025) (Hooker Decl. Ex. Q); *Anne Arundel County v. Express Scripts, Inc.*, 2025 WL 254807 (D. Md. Jan. 21, 2025).

[5] Attorneys practicing before this Court are bound by the Kentucky Rules of Professional Conduct. *See* LR 83.2(a)(3); LR 83.3(c).

has a legal privilege not to disclose and which is not otherwise available to the public.

Rule 1.11(c) prohibits Motley Rice from pursuing claims against OptumRx on behalf of clients in private litigation when the firm could use the confidential information that it acquired through government investigations to OptumRx's material disadvantage in the litigation. Because of the overlap between Motley Rice's investigations and the theories in this case, there is no question that Motley Rice *could* use the confidential government information to OptumRx's material disadvantage in this litigation. Rule 1.11(c) thus requires disqualification.

**A.    Ethics rules have long forbidden lawyers' misuse of government power for private gain.**

Rule 1.11 exists to facilitate the ethical movement of lawyers between government service and private practice while protecting against abuses of government power and the erosion of public trust. It imposes rules for "*special*" conflicts of interests—conflicts *above* those that all lawyers must guard against. Ky. R. Prof'l Conduct 1.11 (emphasis added)). Subsection (c) does so by imposing a blanket prohibition on any private representation where information obtained through government service *could* be used against an adverse party in the private litigation. *See* ABA Comm. on Ethics & Prof'l Resp., Formal Op. 509 at 2 (Feb. 28, 2024) ("The objective of [Rule 1.11(c)] is to prevent the lawyer's improper use of his or her official position and to protect others from the exploitation of confidential government information, acquired by the lawyer while serving as a public officer or employee." (citation and quotation marks omitted)).

This is not a new principle. From its first publication through today, the ABA Model Rules of Professional Conduct[6] and their predecessors have precluded private lawyers from doing what Motley Rice attempts here. *E.g.*, Canons of Prof'l Ethics, Canon 36 (Am. Bar Ass'n 1928) ("A

---

[6] Kentucky Rule 1.11(c) is identical to ABA Model Rule of Professional Conduct 1.11(c).

lawyer, having once held office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ."). The judiciary enforces those rules by disqualifying lawyers attempting to misuse government power to benefit themselves or their other clients in civil litigation. *E.g.*, *Allied Realty of St. Paul, Inc. v. Exchange Nat'l Bank of Chi.*, 283 F. Supp. 464, 465, 467, 470 (D. Minn. 1968) (disqualifying former government lawyer from litigating against corporate executives whom the lawyer had criminally prosecuted as a "Special Assistant United States Attorney" because a lawyer may not "avail himself, after his government service, of a private legal retainer which involves not just his experience, knowledge, and expertise acquired while in the government employ, but involves the use of his knowledge of a particular case or proceeding"), *aff'd*, 408 F.2d 1099 (8th Cir.), *cert. denied sub nom*, *Abrahamson v. Exchange Nat'l Bank of Chi.*, 396 U.S. 823 (1969); *Hilo Metals Co. v. Learner Co.*, 258 F. Supp. 23, 25–27 (D. Haw. 1966) (disqualifying former DOJ lawyer in private antitrust action against companies whom the lawyer had investigated while with the DOJ); *Handelman v. Weiss*, 368 F. Supp. 258, 264 (S.D.N.Y. 1973) (explaining that without the disqualification rules, "[n]ot only would attorneys be tempted to subordinate their official duties to their private goals, but confidence in the integrity of the attorneys selected by [the government] would be destroyed"); *Gen. Motors Corp. v. City of New York*, 501 F.2d 639, 648–52 (2d Cir. 1974) (disqualifying lawyer in a suit against GM when the lawyer had previously investigated GM in similar matters because, "[w]here the overlap of issues is so plain, and the involvement while in Government employ so direct, the resulting appearance of impropriety must be avoided through disqualification").

Kentucky Rule 1.11(c) encapsulates and builds on these longstanding ethical principles and policy considerations. *See* Montgomery/Muchman Report at 18–22. The Rule forbids a former

or existing government lawyer from taking on a representation in which they "could" use information learned during their government service to the material disadvantage of their adversary in the private litigation. The Rule is inherently forward-looking: If the government lawyer *could* use the confidential government information to the adverse party's material disadvantage, then the lawyer *must not* take on the representation—period. The potential for abuse is so acute and the concerns are so grave that the mere *possibility* that the government attorney could use the information is enough to require disqualification.

### B. Motley Rice has violated Rule 1.11(c).

Four elements establish a Rule 1.11(c) violation: (1) the lawyer is or was a "public officer or employee"; (2) while a public officer or employee, the lawyer acquired "confidential government information" about a party; (3) the lawyer is currently representing a "private client whose interests are adverse" to that party; and (4) the current private representation is "in a matter in which the information could be used to the material disadvantage of that" party. Ky. R. Prof'l Conduct 1.11(c). By representing the Commonwealth against OptumRx here in this case, Motley Rice violates Rule 1.11(c).

### 1. Motley Rice was a "public officer or employee" when it investigated OptumRx, and the Commonwealth is the firm's "private client" here.

Motley Rice easily meets both the "public officer or employee" and "private client" elements. *First*, Motley Rice was a "public officer or employee" when it investigated OptumRx on behalf of D.C., Hawaii, and Chicago. By investigating OptumRx on behalf of three governments, Motley Rice wielded government power to obtain nonpublic information about OptumRx. Rule 1.11(c) applies on those facts. In Formal Opinion 509, the ABA explained that Model Rule 1.11(c)—which is identical to Kentucky Rule 1.11(c)—"applies . . . to lawyers in private practice who are appointed to be special prosecutors and continue to represent private

12

clients." ABA Formal Op. 509 at 8. Motley Rice exercised government power on behalf of three governments—power that it could not have wielded *but for* its special government appointments. *See also In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *7 (concluding Motley Rice "was acting as a public officer or employee" when investigating OptumRx on behalf of Hawaii, D.C., and Chicago); *L.A. County*, order at 3–4; *Anne Arundel County*, 2025 WL 254807, at *8.

*Next*, the Commonwealth is Motley Rice's "private client." "[P]rivate client" means *any* person or entity that a lawyer represents in a private capacity, "includ[ing] *public* entities." ABA Formal Op. 509 at 8; *see also* Ky. R. Prof'l Conduct 1.11, cmt. 4 ("[W]here the successive clients are a government agency and another client, *public or private*, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client." (emphasis added)). Here, the Commonwealth is Motley Rice's private client. *See also In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *7–8 (holding that public-government bodies, like cities and counties, are Motley Rice's "private clients"); *Anne Arundel County*, 2025 WL 254807, at *9.[7]

### 2. Motley Rice obtained "confidential government information" about OptumRx through the D.C., Hawaii, and Chicago investigations.

Motley Rice also obtained "confidential government information" about OptumRx. Rule 1.11(c) defines "confidential government information" as information that (1) was "obtained under governmental authority," (2) "the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose," and (3) "is not otherwise available to the public." Ky. R. Prof'l Conduct 1.11(c). "Information" is a broad term that includes not only tangible materials but also strategic insights, recollections, and mental impressions. *E.g.*, *Villaspring*, 2011 WL 5330790, at *6 ("strategic insights, such as [the lawyer's] knowledge of the strengths and weaknesses of the

---

[7] *See also L.A. County*, order at 6 (noting that Motley Rice did not dispute that Los Angeles County "is a private client with adverse interests").

evidence compiled against [the investigated company]," are confidential government information that "[he] may not now use . . . to benefit his client"); *Kronberg v. LaRouche*, 2010 WL 1443934, at *4 (E.D. Va. Apr. 9, 2010) ("At the very least, Markham surely has a mental roadmap concerning LaRouche and his activities that was shaped at least in part by his access to confidential government information."). And it includes both information obtained *from* the adverse party and information obtained *about* the adverse party from any source. *See* Ky. R. Prof'l Conduct 1.11(c) ("confidential government information *about* a person" (emphasis added)).

Through its government investigations, Motley Rice obtained a vast amount of confidential information about OptumRx. OptumRx produced to Motley Rice more than 68,000 documents. The other courts that have denied OptumRx's disqualification motions considered only that set of documents. But Motley Rice also obtained "information about" OptumRx beyond those produced documents—for example, the memos that Motley Rice drafted synthesizing what they learned from their investigations (like the reports that Hawaii and D.C. required Motley Rice to submit to the Attorneys General). *See, e.g.*, Haw. Special AG Agmt. at A1-1 to -2; D.C. Engagement Ltr., Statement of Work §§ 4.1.3, 4.1.5. It also includes information that Motley Rice gathered in meetings with OptumRx. Caplis Decl. ¶¶ 7, 18; Grant Decl. ¶ 7. And it includes any information about OptumRx that Motley Rice obtained from *other* investigation targets. All those types of information about OptumRx qualify as "confidential government information" under Rule 1.11(c).

*First*, as discussed above, Motley Rice obtained the information "under governmental authority" in its investigations for D.C., Hawaii, and Chicago. *See* Haw. Subpoena at 1; Haw. Rev. Stat. §§ 28-2.5, 480-18, 661-22; D.C. Subpoena at 1; D.C. Code § 28-3910; Chicago Subpoena at 1; Chi. Mun. Code § 2-25-090(a). Each investigatory subpoena was the state-law equivalent of a federal civil investigative demand—each used investigatory power that is uniquely vested in the

government and exceeds the type of subpoena power available to private litigants. Absent governmental authority, Motley Rice would not have obtained information from OptumRx through meet-and-confers, OptumRx and others would not have produced documents to Motley Rice, Motley Rice would not have developed strategies and impressions from the materials and investigations, and Motley Rice would not have compiled privileged memos for the governments.

*Second*, Motley Rice and the governments are "prohibited by law from disclosing to the public" and have "a legal privilege not to disclose" the information obtained about OptumRx through the investigations.[8] *E.g.*, Haw. Rev. Stat. § 480-18(j); D.C. Code § 2-534(a)(1); 5 Ill. Comp. Stat. 140/7(g); *see also* Montgomery/Muchman Report at 32–37, 40–41. The confidentiality agreements that Motley Rice executed with OptumRx confirm as much. The Hawaii agreement limits Motley Rice's disclosure of information to certain state and Motley Rice employees (Haw. Conf. Agmt. ¶ 4) and requires that they use that information "solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public" (*id.* ¶ 2). Motley Rice also agreed "not to rely on Confidential Information in pursuing information or claims in any other matters outside of its representation of the State." *Id.* The D.C. and Chicago agreements include similar language. D.C. Conf. Agmt. ¶¶ 4, 8–10; Chicago Conf. Agmt. ¶¶ 3–4, 9, 11.

*Third*, the information is not "otherwise available to the public." The documents that OptumRx produced to Motley Rice included a wide range of proprietary and nonpublic information, including information related to formulary development, business strategies, rebate

---

[8] Under Rule 1.11(c) *either* the fact that the government "is prohibited by law from disclosing to the public" *or* the fact that the government "has a legal privilege not to disclose" meets this second element of "confidential government information."

negotiations and agreements, and financial data. Those materials are not available to the public. Hooker Decl. ¶¶ 5–9.[9] Information from Motley Rice's meetings with OptumRx are not available to the public. Motley Rice's strategies and impressions from the investigations are not available to the public. And the privileged memos that Motley Rice prepared are not available to the public. In short, if OptumRx (or anyone else) subpoenaed Motley Rice for all information from the investigations (or requested it from the governments under public records laws), Motley Rice and the governments would claim that laws or privileges (like attorney-client privilege, attorney work product, or investigative privilege) prevent disclosure. Indeed, several governments have denied public-records requests for investigation-related materials about OptumRx on that very basis. For example, Wyoming—which has retained Motley Rice attorneys as "Special Assistant Attorneys General"—recently refused to produce investigation-related documents in response to a public-records request, claiming that such documents "are confidential under the attorney work product and/or attorney-client privileges" or that production "would be contrary to the public interest for several reasons." Hooker Decl. Ex. R. Likewise, Hawaii itself refused to produce information pertaining to its Motley Rice-led investigation in response to a public-records request, claiming that such records are exempt from disclosure under the state's public-records laws because the statute "exempts from disclosure records 'pertaining to the prosecution or defense' of any judicial action to which the State may be a party 'to the extent that *such records would not be discoverable*[,]' and records protected from disclosure pursuant to state law." Hooker Decl. Ex. S.

---

[9] In other cases, Motley Rice has argued that OptumRx cannot unilaterally designate materials as confidential. But that is not what Rule 1.11(c) focuses on. All it asks is whether the information is "available to the public." If it is not, then it meets Rule 1.11(c)'s test. The fact that OptumRx designates the materials as confidential *underscores* that the information is not available to the public, but it is *that the materials are not available* that satisfies Rule 1.11(c)'s test.

The information about OptumRx that Motley Rice has been gathering through these many investigations over a period of years is not "otherwise available to the public."

In sum, Motley Rice obtained "confidential government information" about OptumRx through its investigations. That implicates Rule 1.11(c). *E.g.*, Montgomery/Muchman Report at 24–41; *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4 (N.D. Ohio Mar. 20, 2019) ("information concern[ing] the inadequate staffing levels, funding deficiencies, strategies, initiatives, operations, and allocation of resources" constituted confidential government information); *Villaspring*, 2011 WL 5330790, at *6 ("strategic insights, such as [the disqualified lawyer's] knowledge of the strengths and weaknesses of the evidence compiled against [the investigated company]," constitute confidential government information); *Kronberg*, 2010 WL 1443934, at *4 ("At the very least, Markham surely has a mental roadmap concerning LaRouche and his activities that was shaped at least in part by his access to confidential government information."). The Rule is concerned with both the free flow of *documents* between cases and the *use of knowledge* gleaned by a lawyer during their government service. *See* Ky. R. Prof'l Conduct 1.11, cmt. 8; *Kronberg*, 2010 WL 1443934, at *3.

### 3. Motley Rice could use the confidential government information to OptumRx's "material disadvantage" in this case.

Finally, the confidential government information about OptumRx that Motley Rice obtained could be used to OptumRx's "material disadvantage" in this litigation. The analysis is straightforward. The "material disadvantage" standard focuses on what the lawyer knew when they took on the private representation. The Rule is inherently forward-looking: If the lawyer *could* use confidential government information to the investigated party's material disadvantage, then the lawyer may not take on the representation—period. The MDL court recognized as much when it disqualified a defense lawyer because confidential information about two plaintiffs that the lawyer

17

obtained through her government service was relevant to the lawyer's later private litigation adverse to those two plaintiffs. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *6 ("Nor is it necessary to try to determine whether Ms. Rendon has used any of this information in defending Endo, as Rule 1.11(c) prohibits representation when the information ***could*** be used to the material disadvantage of Cleveland or Cuyahoga County." (emphasis in original)). The "material disadvantage" standard concerns the relationship between the information and the representation. It turns on whether the information at issue is relevant to the private representation and can be used against the adverse party. It does not turn on a comparison of how the information could be used by different lawyers. That other lawyers might gain access to the "confidential government information" by other means is irrelevant—whether the information can be used to a party's material disadvantage does not depend on *who* uses it.

The confidential government information about OptumRx that Motley Rice obtained is relevant to this litigation and could be used against OptumRx here. Thus, the confidential government information "could be used to the material disadvantage of" OptumRx here. Again, the analysis is straightforward. The government investigations focused on OptumRx's rebate negotiations, formulary development and clinical analysis, and financial data related to rebates. *See, e.g.*, Haw. Subpoena, Requests 1, 5, 6, 12; D.C. Subpoena, Requests 1, 4, 5, 10. The liability theory in this case focuses on many of the same aspects of OptumRx's business. For example, the second amended complaint here alleges that OptumRx "colluded with opioid manufacturers affirmatively to increase opioid prescribing" and "conspired with Purdue in several crucial ways to expand opioid market and increase the sales and prescribing of OxyContin." ECF No. 128 ¶ 405; *accord* ¶¶ 18, 44, 50. Thus, information obtained about OptumRx from those government investigations is directly relevant to this case.

The confidential information about OptumRx that Motley Rice obtained in its government service provides the firm with a roadmap for litigating against OptumRx on those aspects of its business in this litigation. As government lawyers, Motley Rice learned confidential, competitively sensitive information about OptumRx's structure, committees, clinical and business processes, data, negotiations with manufacturers, and interactions with clients. Motley Rice could use that knowledge in this case against OptumRx—including by refining liability theories and allegations, pressing for additional documents in targeted areas, using earlier learnings to seek discovery of additional or different custodians or data, and so on. It is precisely this type of situation that Rule 1.11(c) is designed to prevent because the lawyer has "great potential for lucrative returns in following into private practice the course [it] already charted with the aid of governmental resources." *Gen. Motors Corp.*, 501 F.2d at 650. Given the overlap between the investigations and this litigation, the possibilities are endless. *See* Montgomery/Muchman Report at 41–47. Indeed, that is why Rule 1.11(c) does not prohibit only the *use* of the information in later private litigation; it prohibits the *entire representation* as long as the information *could* be used.[10]

## II.  THE COURT SHOULD CONDUCT ITS OWN INDEPENDENT ANALYSIS OF THE FACTS AND LAW AND REJECT OTHER COURTS' INCORRECT APPLICATIONS OF RULE 1.11(c).

A principled and factual application of Rule 1.11(c) requires disqualification of Motley Rice in this case. Yet Motley Rice will no doubt argue that the Sixth Circuit already decided this issue when a panel rejected OptumRx's mandamus petition related to the denial of OptumRx's disqualification motion in the MDL. But that rejection was based on the panel's determination that

---

[10] Under Rule 1.11(c), "[a] firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely screened from any participation in the matter . . . ." Screening is not an option here because Motley Rice's entire Public Client group received the confidential government information and is suing OptumRx across the country. It is also far too late to screen. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *5 (disqualifying firm "to the same extent" as lead lawyer).

"mandamus is not the appropriate avenue to challenge a district court's disqualification order" and that OptumRx had not pursued other avenues of relief before seeking mandamus. *In re OptumRx*, 2024 U.S. App. LEXIS 26695, at *1–2. Although the panel addressed the merits of the petition nonetheless, it opened that discussion with the following: "*[e]ven assuming* that mandamus review is available to OptumRx and that it lacks an adequate alternative, it has not shown that its right to the writ is clear and indisputable." *Id.* at *2 (emphasis added). By using "hallmark language of dicta," the panel rendered its subsequent discussion of the merits non-binding on this Court. *Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th 304, 325 (6th Cir. 2024).

Motley Rice is also likely to point to other courts that have denied OptumRx's similar motions. But those courts' decisions do not bind this Court. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). In any case, those other courts misinterpreted Rule 1.11(c)'s legal import and misapprehended the relevant facts. For example, the MDL court (the first to deny OptumRx's motion) "frown[ed] on" Motley Rice's actions and acknowledged that Motley Rice's conduct "pose[d] a serious 'risk . . . that power or discretion vested in [Motley Rice] might be used for the special benefit of [their private] client,' or create a conflict of interest." *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *16. It explained that Motley Rice "needs to adhere to all the same rules to which government lawyers are subject." *Id.* at *8. But despite those findings and grave warnings, the MDL court denied OptumRx's disqualification motion, concluding that Motley Rice had not *technically* violated Rule 1.11(c) based on the "unique facts" of the MDL. *Id.* at *8 n.9. And other courts that denied motions to disqualify Motley Rice also made some combination of the MDL court's fundamental errors.

*First*, those courts eviscerated Rule 1.11(c)'s definition of "confidential government information" by holding that any information subject to civil discovery is not "confidential

government information." *Id.* at *8–11; *see also L.A. County*, order at 4–6. They did so in the face of numerous authorities to the contrary. The ABA has explained that the "conceptualization of 'confidential government information' [in Rule 1.11(c)] is analogous to the definition of 'nonpublic information' in 5 C.F.R. § 2635.703(b)," which "defines 'nonpublic information' as information that an employee obtains due to Federal employment and that he knows or reasonably should know: '(1) Is routinely exempt from disclosure under 5 U.S.C. [§] 552 [FOIA] or is protected from disclosure by statute, Executive order or regulation; (2) Is designated as confidential by an agency; or (3) has not actually been disseminated to the general public and is not authorized to be made available to the public on request.'" ABA Formal Op. 509 at 4 n.13. The information that Motley Rice acquired about OptumRx in those investigations is undisputedly exempt from FOIA (or the state-law equivalent) disclosure and is barred from public disclosure by the confidentiality agreements. That should end the inquiry.

But those courts held that if information—no matter how confidential or proprietary—can be requested and produced in civil discovery, it cannot be "confidential government information." That reasoning flatly ignores the plain language of Rule 1.11(c). The definition of "confidential government information" turns on whether the information is "otherwise available to the public," not whether the information is obtainable through civil discovery.[11] Of course, documents are not

---

[11] Motley Rice, and those courts, seized on language in ABA Formal Opinion 509 stating that "[w]hether government information is publicly available—e.g., whether it can be obtained through *routine discovery*—will be a question of fact." ABA Formal Op. 509 at 5 (emphasis added). But they misinterpret "routine discovery" (a phrase that is not in Rule 1.11(c) itself). Whether information "can be obtained through routine discovery" is about whether information can be obtained by the public from the government, not from private parties in civil litigation. *See also* Montgomery/Muchman Report at 28 (explaining that the ABA's opinion confirms that the "routine discovery" language does not apply to information produced under a protective order or confidentiality agreement and noting that "[r]outine discovery does *not* include information subject to a protective order, such as proprietary or trade secret information, nor does it include information produced pursuant to Confidentiality Agreements signed by government lawyers").

"available to the public" simply because they are produced in civil discovery. *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (materials obtained through civil discovery are not "a traditionally public source of information"); *In re Carpenter Co.*, 2014 WL 12809636, at *1 (6th Cir. Sept. 29, 2024) (pretrial discovery "typically occurs outside the public eye"). Under those courts' reading, "routine discovery" would encompass literally everything—save perhaps the nuclear codes. Tellingly, those same courts never explained what would qualify as "non-routine" discovery. Since *everything* would be "available to the public," *nothing* would be confidential government information.

Government attorneys (and not just specially appointed ones) could investigate a party and later sue that party on behalf of private clients. Rule 1.11(c) contains no "civil discovery" exception, and the ABA committee cited many cases in which courts have disqualified counsel for having access to information that parties could obtain through discovery. *E.g.*, ABA Formal Op. at 4 n.8–9, 5 n.11–12, 5 n.14, 6 n.15, 7 n.25, 9 n.27.[12] Indeed, in the opioid MDL, the court disqualified a defense lawyer who, in former government service, had access to "information concern[ing] the inadequate staffing levels, funding deficiencies, strategies, initiatives, operations, and allocation of resources"—all obtainable through discovery. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4–5.

---

[12] *See also Villaspring*, 2011 WL 5330790, at *6 ("strategic insights" from "interviewing [the] facility's former employees"); *Kronberg*, 2010 WL 1443934, at *4 (E.D. Va. Apr. 9, 2010) ("structure" of the business and "the role of other individuals" who worked for the business); N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 1187 at 2–3 (2020) ("information" a lawyer, also a police officer, acquired that was "unfavorable employment reviews or non-public discipline"); N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 1169 at 4 (2019) (information a government lawyer acquired as a Town Supervisor); Neb. Ethics Advisory Op. for Lawyers No. 22-01 at 3149 (2022) (information that a government lawyer acquired from "a state-run database containing information . . . including (potentially) an individual's current financial information, location, prior employment and past earnings").

*Second*, those courts misread Rule 1.11(c)'s "material disadvantage" standard. The MDL court relied on prior discovery orders in the opioid MDL to conclude that OptumRx should have already produced in the MDL the documents it produced to Motley Rice in the government investigations. The court ordered OptumRx to produce those documents into the MDL, and the other courts since have concluded that OptumRx can suffer no "material disadvantage" because all attorneys in the MDL now have access to those documents. *See In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *11–15; *In re OptumRx*, 2024 U.S. App. LEXIS 26695, at *3–4; *City of Boston*, order at 1–2; *L.A. County*, order at 7–8; *Anne Arundel County*, 2025 WL 254807, at *9–10. The MDL court purported to cleanse Motley Rice of its ethical violations but recognized that "were it not for the standing Repository obligations . . . , the Court's discussion and analysis in this Order might have been different." *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *16. That decision was wrong and unprecedented. For one thing, that erroneous holding is irrelevant in this case where there have been no discovery orders. More critically, the decision is a plain misinterpretation of "material disadvantage"—a standard that simply assesses whether the information is relevant to the current litigation and can be used against the adverse party. But Rule 1.11(c) does not consider *relative* disadvantage to the adverse party depending on which lawyer is using the information. That the documents are now available in opioid litigation and being used against OptumRx by lawyers who have *not* served as government lawyers only underscores that Motley Rice *could* use them to OptumRx's material disadvantage.

*Third*, those courts misapprehended relevant facts. They focused only on the specific documents that OptumRx produced to Motley Rice in the investigations. *E.g.*, *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *3 ("[D]isqualifying Motley Rice will not protect that information, which is otherwise discoverable and which OptumRx should have already

produced in the MDL."); *id.* at *8–16 (focusing on documents obtained by subpoena); *In re OptumRx*, 2024 U.S. App. LEXIS 26695, at *3 (reasoning in dicta that there was "no material disadvantage" because "any information . . . should have already been produced"); *City of Boston*, order at 1–2 (similar); *L.A. County*, order at 7 (similar); *Anne Arundel County*, 2025 WL 254807, at *9 ("Here, the County's non-Motley Rice attorneys, just like its Motley Rice counsel, have access to the documents in the MDL discovery repository.").[13]

Those courts mistakenly considered *only* the documents produced by OptumRx. But even accepting the faulty premise that the availability of those documents in discovery means they cannot be used to OptumRx's material disadvantage, those documents are not the only confidential government information at issue. As discussed, Motley Rice's "information about" OptumRx extends beyond those produced documents, including (1) memos that Motley Rice drafted from its synthesis of the documents and its investigation as a whole (*e.g.*, Haw. Special AG Agmt. at A1-1 to -2; D.C. Engagement Ltr., Statement of Work §§ 4.1.3, 4.1.5), (2) information that Motley Rice obtained in meetings with OptumRx (Caplis Decl. ¶¶ 7, 18; Grant Decl. ¶ 7), and (3) any information about OptumRx that Motley Rice obtained from *other* sources. That is all

---

[13] The MDL court and the Sixth Circuit also took issue with the timing of OptumRx's motion in the MDL, claiming that OptumRx should have raised the issue as far back as 2018. *See In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288, at *4–6; *In re OptumRx*, 2024 U.S. App. LEXIS 26695, at *4–5. Even Motley Rice did not make that argument, and for good reason. The D.C. and Hawaii investigations did not exist in 2018, so OptumRx could not have sought disqualification in 2018 based on them. Moreover, in 2018 Motley Rice was not "represent[ing] a private client whose interests [we]re adverse to" OptumRx in the opioid litigation. Ky. R. Prof'l Conduct 1.11(c). OptumRx promptly raised the ethical violation in March 2023, after Motley Rice began actively litigating against OptumRx in bellwether cases. Regardless, any concern about the timing of OptumRx's MDL motion is inapplicable here because OptumRx has promptly moved for disqualification.

"confidential government information" about OptumRx unaccounted for in those courts' orders.[14] (And much of that information—like privileged memos—is *not* available through discovery.)

## III.    THE REMAINING FACTORS WEIGH IN FAVOR OF DISQUALIFICATION.

Courts must enforce ethics rules while guarding against the "misuse of disqualification motions for strategic reasons." *Culbreth v. Covington Bd. of Educ.*, 2007 WL 3124711, at *1 (E.D. Ky. Oct. 24, 2007) (cleaned up). That risk does not exist here.[15] OptumRx had no choice but to comply with the government investigations. And OptumRx has promptly raised the ethical issue in this case. This motion is grounded in legitimate and clear-cut ethical concerns. No remedy other than disqualification will resolve the conflict. It would be impossible for Motley Rice's lawyers *not* to use what they learned through their service as government investigators for their clients' and their own benefit. *See* Montgomery/Muchman Report at 35–38. Nor will disqualification prejudice the Commonwealth. This litigation is in its infancy, and the Commonwealth is represented by other competent, non-conflicted attorneys.

## CONCLUSION

As OptumRx's two ethics experts—one of whom is on the ABA's Standing Committee on Ethics and Professional Responsibility—have explained, "[t]here can be no more obvious violation of Rule 1.11(c)" than Motley Rice's violation here. Muchman/Montgomery Report at 49; *see also id.* ("We do not believe that this is a close call."). The Court should disqualify Motley Rice.

Dated this 3rd day of June, 2025.

---

[14] One court dismissed OptumRx's argument about "non-documentary confidential government information" as "speculative, vague, and amorphous." *L.A. County*, order at 6. But OptumRx has identified *specific* types and examples of non-documentary confidential government information.

[15] This is true notwithstanding the Sixth Circuit's ruling on OptumRx's mandamus petition, which should not carry weight here for the reasons explained above. In any case, OptumRx is entitled to bring this motion to preserve its appellate rights.

_/s/ Carol Dan Browning_
Carol Dan Browning
STITES & HARBISON PLLC
400 W. Market Street, Suite 1800
Louisville, Kentucky 40202-3352
T: (502) 587-3400
cbrowning@stites.com

Daniel E. Danford
STITES & HARBISON PLLC
250 West Main Street, Suite 2300
Lexington, Kentucky 40507-1758
T: (859) 226-2300
ddanford@stites.com

Brian D. Boone (_pro hac vice_)
Caitlin Van Hoy (_pro hac vice_)
**ALSTON & BIRD LLP**
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
T: (704) 444-1000
F: (704) 444-1111
brian.boone@alston.com
caitlin.vanhoy@alston.com

Matthew P. McGuire (_pro hac vice_)
**ALSTON & BIRD LLP**
555 Fayetteville Street, Suite 600
Raleigh, NC 27601
T: (919) 862-2200
F: (919) 862-2260
matt.mcguire@alston.com

_Counsel for OptumRx, Inc._

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 3rd day of June, 2025, the foregoing document was filed through the CM/ECF system and will be sent electronically to counsel of record.

_/s/ Carol Dan Browning_
Carol Dan Browning